May it please the Court, Laurie Schoenberg of the Federal Defenders of San Diego, representing the defendant, appellant in this case, Arturo Hernandez. What I'd like to do initially is reserve two minutes for rebuttal. What we're really dealing with here is the authority of any low-level border inspector to take apart a car door without any degree of suspicion at all, without any evidence that the car or the door could be put back together safely, and with no constitutional scrutiny at all. What is the safety aspect of taking the panel of the door off anyway? Well, there's a couple of safety aspects. The first safety aspect is that in this particular case, the electrical panel was actually ripped out of the car. You can actually see that on Government's Exhibit 2 at the Supplemental Excerpts of Record. What's the safety implication in a 1991 Buick Skylark? Well, the safety implication might be that if the electrical wiring was put back together and it was wired improperly, it might cause a fire in the car. It might disrupt the electrical apparatus of the car, particularly if it is an old car. That is a risk that, you know, something might be put back together with the wrong parts. If the door … Is there a risk that wasn't taken when the drugs were put into the panel and the panel was put back? I can't account for that, Your Honor. I don't know what kind of risk was undertaken there. My understanding, based upon the record … It's not that the panel was taken off for the drugs to go in the same way that the panel was taken off to get the drugs out. That is to the effect … That there's no … … that it was discovered once the panel was taken off. Is it … do we … are we supposed to assess it as to the safety risk of a potentially innocent car or one where the drugs are actually found? We're supposed to assess it based on the safety of … I don't think the innocence or the guilt of the car matters in this particular case. According to the record … My point is I don't understand what the safety aspect is. If it was unsafe, it was unsafe to take the panel off to begin with. Well, Your Honor, there's no clear record in this case because we were denied an evidentiary hearing on the issue. All that I can say is that common sense would tell us at least if the electrical wiring was rewired improperly, and I can't account for any differences … So you're saying taking a panel of a door off is more unsafe than taking a gas tank out? In this particular case, yes, because in Flores-Montano, they actually submitted affidavits to the contrary, specifically Appendix D and Appendix E to the government's petition for a bit of search wiring. And that case stated that not only had, I think, 348 cars been … had their gas tanks disassembled, reassembled, and traveled into the United States without incident, but that the search in that particular case was actually not destructive to the car. Okay. I'm now getting a little confused. Sure. You started off talking about the door panel. Then Judge Reimer asked you about safety, and you talked about the electrical panel, which is … what are we talking about, a door panel or the electrical system? We're talking about both, Your Honor, because … Okay. Now, if the … in the progression, what evidence is there in the record as to what the progression of this search is? As I understand the government's defense of what they did is they very carefully lifted off a door panel, and then when … then what we see are pictures of a car that's been substantially trashed, including exterior as well as interior. But where in the process did it move from the border search type of Flores, Montana that's been upheld to something where you would be arguing that now it's progressed to where reasonable suspicion is required? Because lifting off a door panel doesn't in and of itself seem to involve an electrical system unless they're power windows or something. Well … Can you just clarify what you … your view of the record is? Well, in this case, at least government's exhibit number two and the photographs that were submitted by defense counsel and entered into evidence as the judges … as per the judge's order indicate that in order to remove the door panel, they did have to disrupt the electrical panel of the car and take it out. So I would argue that the search became something that required reasonable suspicion at the time that that destruction or damage was done to the car. Where does one see that? It's on … it's in the photographs on government's exhibit number two, which are in the government's supplemental excerpt of record. That at least shows the panel separated from the door frame. Additionally, Judge Lorenz in this particular case permitted defense counsel to submit photographs showing … Well, the photographs are totally without foundation, so I can't tell when they were taken, where they were taken, what they mean or anything. So on government's exhibit two, what am I supposed to see there that I don't know what I'm looking at? Government's exhibit number two shows the door, quote, after the panel was removed according to Inspector Pichow at the suppression hearing. And what that shows is that the panel was separated from the door frame. Sure. And the photographs, as well, that defense counsel did submit, as well, show significant damage to the door in the sense that the electrical panel was ripped out, the seat belt was ripped out, and the cellophane. Wait a second. Hold on. What we're talking about here is the initial prying open of the door panel with the screwdriver and looking in and seeing drugs and taking the panel off. So the rest of it, there's probable cause out the gazoo to investigate. So the only thing we're really looking at here is whether the initial look at the panel affected the safety or operation of the vehicle in some particularly offensive way so as to run afoul of what the Supreme Court and Cortez says is the applicable standard. Well, Your Honor, in this case, we don't know, unfortunately, when the damage or destruction to the car occurred or whether it actually occurred during the process of prying open the door panel. Well, what we do know is from the evidentiary hearing that was held, that exhibit one indicates the panel before the officer took anything off and exhibit two shows it afterwards. And he stated that the panel was removed using a screwdriver as a wedge so that if nothing is found, it can be put back together without damage. And given an opportunity to cross-examine that or pursue that line of questioning further, Hernandez didn't do that. So that's what the record shows. So how do you get from what that shows to something that could arguably run afoul of Cortez? Well, Your Honor, I would submit that some of the photographs contradict the inspector's testimony on that issue. In addition, I know that you indicated that there was some agreement to this at the evidentiary hearing. However, that evidentiary hearing was only asked to voluntariness. The district court denied that. Well, that was its purpose. But the inquiry went well beyond it. And so he was on the stand. The judge said you can ask him all the questions you want, following up on how he removed the panel. Right. But at that point he had already ruled on a motion to suppress. So it was futile at that point to ask further questions because it wasn't that bad. I mean, I don't know what's futile about that. Follow up. Keep going. Counsel respectfully thought that the motion to suppress had already been denied. So at that point the hearing was only asked to the voluntariness of the statement. Let me just try to say it a different way. I tried to say what the record shows. And you only get an evidentiary hearing if there's something to be tried. And based upon the showing that's made, how are we supposed to make to infer that you could possibly show the kind of operative or safety effect on the car that would come within Cortez? Well, Your Honor, there wasn't a since an evidentiary hearing in that case was denied, we don't know what the full degree of damage or destruction was to the vehicle, which is why we would ask for a remand for a further evidentiary hearing. Your Honor, I did reserve additional time for rebuttal. Let me ask you one question. Is it clear in the record that they saw the marijuana before they completely removed the panel? No, it's not, Your Honor. On page 16, I believe, of the reporter's transcript in that case, which I think is at page 86 of the ER, he said, quote, and the inspector said, quote, I pulled the panel in order that you know because I was just checking. And when I saw the packages, then I turned out the panel and I tested one package. Well, does that make any difference? Well, it does. You can't move the gas tank and then find the marijuana. You don't have to see the marijuana first. Well, because in this case, there was he had to take apart the panel in order to see the packages in that case. And in the case of the gas tank, all they had to do was unscrew the gas tank. They didn't actually have to take apart the gas tank in order to see the panel. Well, in this particular case, it's not clear what the degree of damage or destruction was. Okay. All right. Thank you, Your Honor. All right. Mr. Rahe. Good morning, Your Honors. May it please the Court, Mark Rahe for the United States. Your Honor, in this case, this is the first I've heard anything about an electrical panel. When I reviewed the record of this case, there was never any proff or testimony below that this particular search was unsafe because of any impact it would have on an electrical panel. As Judge Reimer pointed out, at the evidentiary hearing, and granted, the evidentiary hearing was initially for the purpose of voluntariness, but without a doubt, the amount of force did come up. And the inspector testified very clearly what kind of force was used in removing the panel initially. And he responded, initially, just the way that we do no damage to the vehicle. We remove in an easy way. That way, if we do not find anything, we can put it back together without damage very gently. And that's at excerpt of the record, page 87. And when one looks at excerpt of the record from 87 through 89, the most reasonable inference is exactly as Judge Reimer described it. This inspector, he used a screwdriver just to wedge open part of the panel. He saw a package. Excerpt of record 88, he's asked if based on his experience, and he said that he saw a package. And excerpt of record 88, he was asked, based on his experience, did that indicate something to him? He said, yes, contraband. And then on the next page, he talks about how he actually field tested that. Does he have to see what he thinks is marijuana before he removes the panel? I don't think so. Your Honor, but in this case, the fact that he does just makes this one an easier case. I mean, I know these issues can lead to all kinds of hypotheticals. And where do we know where to draw the line? But the bottom line is, on these particular facts, there is nothing particularly offensive about this search. Well, let me let me probe that. The photographs that show the total damage to the car, if the last thing found was the marijuana, after all of that destruction was imposed on the car, is the government's position that's okay? And that the remedy, as suggested in our recent cases, file an action for civil recovery against the government to the damage to your car? I would say for the most part, Your Honor. I mean, of course, all these cases will turn on their own circumstances. But the fact that there is a civil remedy is an important part. It's okay to rip up the car? The Supreme Court reserving the question on destructive searches was sort of just an invitation. No? Well, I mean. To come back and give us another shot, and we'll say that's fine, too? Not at all, Your Honor, because as this Court held in Cortez Rojo, when the extent of the damage is one factor, but the impairment of the operation and the impairment of the safety are two other ones. So you think this car was drivable from after? Now, my hypothetical is, because I don't know, that the amount of damage done to this car, as reflected in the photographs, is the amount of damage. And it would have been okay to put that car out on the highway with a broken window, with the panels ripped out, whatever damage happened to the front of the car. And the bumper also. To clarify his question so I understand what the answer is going to be, are you talking about after the damage to all four panels? Yes, yes. I said my hypo was, let's suppose the marijuana wasn't found until after all of the panels, that the only way they found the marijuana ultimately was to destroy the car. Then they found, at the end, they found it. I just want to, because, you know, that was my point. I took, which you started with quite properly, that the agent said, we take it apart very carefully, and then, the implication being, if we have reason based on that, which I assume means you do spot something, like a packaging or something. Isn't that correct? Yes, Your Honor. And I think in a situation. So it isn't just, okay, we pry this one, and then we pry this one, and then we pull the glove compartment out, and then we go into the trunk and we rip open compartments, and then when we're all done, oh, we finally found it, and the car has been destroyed. Now, you know, it's an open question for me, in any event, as to whether safety is the only constraint on the scope of that. But one way or another, I'm just trying to understand what the government is arguing for, because there are photographs in this case which suggest that the totality of the investigation, the physical invasion of this car, was substantial. But I don't know from the record when that, you know, where in the process it moved from border search suspicion, which basically is the cars there, to where even the government would argue it has to have reasonable suspicion to start wreaking havoc. Well, I think. I'd put in one more thing into the equation. The Supreme Court said that it was possible when the search was particularly offensive. Now, what's that mean? Yeah, that's exactly. We don't know exactly. And the way I read Cortez Rocha, it's basically this court's first attempt to give meaning to that phrase. When you look at the extent of the damage, the effect on the safety, the effect on the operation. But to bring you back to what Judge Fischer had asked, I think in this case, the only reasonable inference is that all of that destruction, and as Judge Reimer pointed out, those photographs that were submitted afterwards, there's no timeline on them. No, I know that. I know that. I'm just trying to say if the evidence showed that, in fact, with all of that evidence in, that the timeline proved out that the marijuana wasn't discovered until after all of that damage was wrought, would the government be here arguing that that is still permissible under Flores, Montana? I believe we would, Your Honor. And, of course, we would have to look to the particular facts of that. But we have to keep in mind with the border, as this Court knows, different things pertain. And a vehicle really is just a larger container. And if you look at the ‑‑ I know three cases were sort of put on the same calendar here. An excerpt of record, there's an excerpt in the Flores, Montana case where there's a declaration from Jason Ahern, who was the chief field officer for Customs, talks about, and I believe the statistic may also be in Flores, Montana, 25% of seizures, drug seizures at the port are found in gas tanks, which tells us that, I mean, a vehicle itself. Well, the Supreme Court's addressed that. Right. But I've seen it used. You can do gas tanks, and now the question is moving from there. The open areas that haven't been filled in by our own case with the spare tire is where is there any line? And so that's what we're wrestling with. Right. And I know it's always hard to set these lines. I just, in this case, I don't think there can be any question, though, that it falls on the right side of the line. And why do you think that? Because basically the way this inspector, and I can't say his last name, Pachow, I mean, the way he basically testified under oath, and I pointed out an excerpt of record 87, he was asked what kind of force did he use, and he indicated a progressive response. He didn't say I came up willy‑nilly and just tore the car apart. He said he used a screwdriver to wedge the panel apart. And he didn't even say the whole panel. In excerpt record 91 through 92 on cross‑examination by defense counsel, he was asked, now, in order to reach those drugs, you stated you had to take off the panel. No, just remove the one part. So he's talking about a very limited intrusion. And, again, we don't know exactly what particularly offensive means, but just by its, you know, it's almost, I believe somebody in the 70s talked about an obscenity case. You know it when you see it. And I know that may not help this Court much at all, but if you have an inspector who's saying he takes a very simple tool, he makes a very limited progression, and then after finding those drugs, he takes the car apart, that is entirely permissible. And it comes from that 1920s prohibition case, too, I believe, Carroll. What you've just been describing is what he did to the first, to the driver's side door. Correct. And after he found one package there, he had it field tested. Right. And then he arrested Hernandez, right? Correct. Then he completed the inspection of the vehicle, which involved taking the panels off other doors, and he found three more packages on the passenger's side and two more on the rear passenger's door. Rear gate, right. Correct. But that's after he. All after probable cause has already been established. Exactly. And under the Supreme Court precedent in Carroll and Ross, once you find some drugs in a vehicle, they basically indicate your freedom to tear it apart. In fact, in the Carroll case, they used the words they tore into the upholstery at the back of that Model T, and that's where they ended up finding the whiskey. But in this case, that's why I don't want this court to be deceived by those photographs. That's all after the fact. The testimony that we have in front of us from this inspector was that he made a very limited intrusion to one part of the door panel. He saw the drugs. And so the only reasonable inference is that all this other damage that you see flowed afterwards. And I would say that. The defendant argues that they were prevented from exploring that through cross-examination and to test it. So what you're representing to us is the government's position. But Judge Lorenz, at some point, restricted the ability of the defendant. What's your take on that? My take on that was that a door was then opened to a defendant. Stranger things happened in the district court. And for whatever inexplicable reason, they didn't take advantage of it. And that's, I believe, an excerpt of record at page 92. Because as defense counsel pointed out, you're right, this argument was about voluntariness at first. But then for whatever reason, the prosecutor started probing the amount of force. And then the defense counsel perceptibly argued that that opened the door. And, yeah, this is excerpt from 92. And the court says, you can follow up on that a little bit. And then the defense counsel, the very next line is, let me actually take you to the point where you said that you ordered Mr. Hernandez out of the vehicle. I can't speak for defense counsel. And sometimes district courts make rulings. You think the doors are closed to you. But here the door was open. The district court is entirely within its discretion to then allow testimony. For whatever reason, defense didn't take advantage of that. And we would argue then that it's waived. And even beyond that, though, there was never any proffer. I mean, even if you go to the beginning of the district court's ruling before this testimony took place, that's why I was a little perplexed by the references to the electrical panel. Unless I'm missing something, I never heard about anything of that. If that had been proffered, maybe this would be a different case. Who knows? But no such proffer having been made, the district court can only weigh whether he should grant an evidentiary hearing on the basis of the proffer before him. And at that time, I don't believe one was warranted. Unless this Court has any further questions, we would submit them. All right. Thank you, Mr. Ray. Ms. Schoenberg will equalize your time, give you a little more extra time for rebuttal. Thank you, Your Honor. Your Honor, just in response to the particular questions about the timing of the photographs, Judge Lorenz actually did allow these photographs into evidence that we're talking about, including the photographs regarding the disruption of the electrical panels. That was at page 9 of the reporter's transcript, and I believe at page 89 of the excerpt of record. While there is a question about the timing of the disruption to the door panels and the disruption of the electrical panels, and I understand Your Honor's position on that, that is precisely why we needed a full inquiry into the degree of damage and destruction of the car at the time that the search was conducted. Do you agree that the inspector testified that he pried the first panel with a screwdriver and saw the marijuana? That is what the inspector testified to. He testified to that. Yes, he did testify to that. But his allegation that his search would not do further damage, permanent damage or destruction to the car is belied by the photographs in this case. And I would like to point out as well that there wasn't that much inquiry into the connection between the electrical panels and the safety of the car because Cortez Rocha and Flores Fontana was not decided at that point, so we didn't even know that that was even potentially a factor in this case. As far as the container search exception is concerned, I know that the government has brought up that Carroll and Ross in particular justified the search in this case, and I would respectfully suggest that Carroll and Ross are distinguishable. First of all, Carroll and Ross are distinguishable. Okay. I think we understand that you're now way over time. Okay. Thank you, Your Honor. We certainly understand that part of your argument. Thank you, Your Honor. Thank you for your argument. The matter just argued will be submitted. And we'll next hear argument in Sheldry. Good morning.
judges: B. Fletcher, Rymer, Fisher